UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

BENJAMIN LOPEZ,

        Plaintiff,

v.

        Case No. 1:18-cv-160

REGAN FOERSTER, et al.,

        Honorable Hala Y. Jarbou

        Defendants.
_____/

**OPINION**

This is a civil rights action under 42 U.S.C. § 1983. Plaintiff Benjamin Lopez was the victim of mistaken identity. He was arrested and detained in jail for 24 days because police officers believed him to be a different person with a similar name. Plaintiff claims that Defendant Randy Graham participated in a decision to prosecute him without probable cause, in violation of Plaintiff's Fourth Amendment rights. Before the Court are motions for summary judgment filed by Plaintiff Lopez and Defendant Graham (ECF Nos. 86, 105). The Court will grant Defendant's motion and deny Plaintiff's motion.

**I. Background**

In June 2017, police detectives with the Traverse Narcotics Team (TNT) worked with a confidential informant to conduct a controlled purchase of heroin in Traverse City, Michigan. The informant told Officers Regan Foerster and John Bush that the purchaser was "Benny Lopez." Benny Lopez was a resident of Traverse City who was on parole at the time. Benny is not related to Plaintiff in any way. According to a police report prepared by Officer Foerster on June 22, 2017, the informant made several phone calls to Benny to arrange to purchase one gram of heroin. (Incident Report, ECF No. 95-6, PageID.671.) TNT officers saw the informant give some cash to

Benny at a gas station. Benny then left the gas station and traveled to the parking lot of a nearby library, where he met with two individuals driving a Cadillac Escalade. A few minutes later, officers observed Benny leave the parking lot to meet with the informant. Officers saw Benny give something to the informant and then leave. The informant met up with Foerster and Bush and gave them the heroin that he had received from Benny.

Foerster assumed that Benny was a nickname or "street name" for Benjamin, so he searched the Law Enforcement Information Network (LEIN) database for Benjamin Lopez; he found Plaintiff's information. (Foerster Dep. 36, 40, ECF No. 95-2.) Accordingly, in his police report, Foerster identified the "suspect" of the investigation as "Benjamin Ben Lopez," who had an alias of "Benny." (Incident Report, PageID.670.) And when describing the "property" obtained from the informant, Foerster wrote in the report that the informant "purchased suspected heroin from Benjamin Lopez." (*Id.*, PageID.675.) Next to Plaintiff's name in the report, Foerster added Plaintiff's biographical data, including his height, weight, ethnicity, driver's license number, and date of birth. (*Id.*, PageID.670.) Foerster obtained all this information from the LEIN system. (Foerster Dep. 36.) Foerster did not obtain the "alias" information from the LEIN database; he added that himself. (*Id.* at 35-36.) Foerster apparently discovered that Plaintiff had a Grand Rapids address, but he did not include that address in the report. (*Id.* at 35.)

The TNT is an intergovernmental task force comprised of officers from multiple jurisdictions around Traverse City. Sergeant Graham was a supervisor for the TNT. That position required him to review active cases on a monthly basis.[1] He reviewed Foerster's report in the

---

[1] Official Order No. 5 of the Michigan State Police states the following about supervision of cases:

> Work site commanders shall utilize the electronic incident reporting system to review open incident reports at regular intervals to ensure that investigations are being actively pursued and that proper progress is being made. They shall also ensure that shift supervisors provide the necessary investigative guidance to enforcement members.

2

Lopez case on July 26, August 9, and September 12, 2017.  (Graham Dep. 24, 27-28, ECF No. 95-1.)  After his first review, he made a journal entry instructing Foerster "to not print narrative on the back of original."  (Incident Report, PageID.676.)  On August 9, he made an entry indicating that the case was "[o]pen pending additional CI purchases into Lopez."  (*Id.*)  Graham reviewed the report again on September 12 and made an entry stating, "Reviewed.  Note to Foerster to pursue further purchases or submit your case for a warrant request."  (*Id.*)  According to Graham, this last note meant that Foerster should "do one of two things," either pursue further purchases with the informant or submit the case for an arrest warrant.  (Graham Dep. 35.)  Graham expected that Foerster would follow his directions or come speak with him about them.  (*Id.* at 40.)

After Graham made his journal entry, Foerster sought an arrest warrant for Plaintiff (Foerster Dep. 18), but when doing so, he did not tell the magistrate judge that the informant had referred to the suspect as "Benny" or that Plaintiff had a Grand Rapids address (*id.* at 46).  The magistrate approved the warrant and the police in Grand Rapids arrested Plaintiff on October 15, 2017.

On November 1, 2017, Graham learned that there was a possibility that the police had arrested the wrong person.  (Graham Dep. 82.)  He told Foerster to contact the prosecutor's office to seek a dismissal of the case.  Graham indicated that he would contact his superiors to have Plaintiff released immediately.  (*Id.* at 83.)  The following day, Graham met with the county prosecutor about Plaintiff's situation.  The prosecutor told Graham that the charges would be dismissed.  However, Plaintiff remained in jail until November 7, when the prosecutor finally dismissed the case against him.

---

(Official Order No. 5, ECF No. 107-6, PageID.842.)

3

Plaintiff claims that Defendants violated his constitutional rights by having Plaintiff arrested and then allowing him to remain in jail after Defendants became aware that they had arrested the wrong person. Graham moves for summary judgment based on qualified immunity.

## II. Standards

### A. Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Courts consider the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 679 (6th Cir. 2013). The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

### B. Qualified Immunity

"Qualified immunity is an affirmative defense that protects government officials from liability 'when a reasonable official in the defendant's position would not have understood his or her actions to violate a person's constitutional rights.'" *Webb v. United States*, 789 F.3d 647, 659 (6th Cir. 2015) (quoting *Meals v. City of Memphis*, 493 F.3d 720, 729 (6th Cir. 2007)). In other words, "officers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). "To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent." *Id.* "[T]here must either be 'controlling authority or a robust consensus of cases of persuasive authority.'" *Guertin v. Michigan*, 912 F.3d 907, 932 (6th Cir. 2019) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 780 (2014)). "[E]xisting law

4

must have placed the constitutionality of the officer's conduct 'beyond debate.'" *Wesby*, 138 S. Ct. at 589 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741-42 (2011)). "This demanding standard protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

"The 'clearly established' standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Id.* at 590 (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). "This requires a high 'degree of specificity.'" *Id.* (quoting *Mullenix v. Luna*, 577 U.S. 7, 13 (2015)). "[C]ourts must not 'define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.'" *Id.* (quoting *Plumhoff*, 572 U.S. at 779).

"Once [an] official[] raise[s] the qualified immunity defense, the plaintiff bears the burden to 'demonstrate that the official [is] not entitled to qualified immunity.'" *LeFever v. Ferguson*, 645 F. App'x 438, 442 (6th Cir. 2016) (quoting *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006)).

### III. Analysis

#### A. Malicious Prosecution

Graham argues that he is entitled to qualified immunity for Plaintiff's malicious prosecution claim because Graham did not make, influence, or participate in the decision to prosecute Plaintiff. The elements of a malicious prosecution claim are as follows: (1) "a criminal prosecution was initiated against the plaintiff and . . . the defendant ma[d]e, influence[d], or participate[d] in the decision to prosecute"; (2) "there was a lack of probable cause for the criminal prosecution"; (3) "as a consequence of a legal proceeding, the plaintiff suffered a deprivation of

5

liberty, as understood in our Fourth Amendment jurisprudence, apart from the initial seizure"; and (4) "the criminal proceeding must have been resolved in the plaintiff's favor." *Sykes v. Anderson*, 625 F.3d 294, 308-09 (6th Cir. 2010) (quotation marks and citations omitted). Graham focuses on the first element.

"The meaning of the term 'participated' should be construed within the context of tort causation principles. Its meaning is akin to 'aided.' To be liable for 'participating' in the decision to prosecute, the officer must participate in a way that aids in the decision, as opposed to passively or neutrally participating." *Sykes*, 625 F.3d at 308 n.5. In other words, "participation must be marked by some kind of blameworthiness, *something beyond mere negligence or innocent mistake*, to satisfy the elements of a malicious prosecution claim under the Fourth Amendment." *Johnson v. Moseley*, 790 F.3d 649, 655 (6th Cir. 2015) (emphasis added). The Fourth Amendment prohibits "*unreasonable* seizures." *Newman v. Twp. of Hamburg*, 773 F.3d 769, 772 (6th Cir. 2014) (emphasis added). "A police officer violates those restrictions only when his *deliberate or reckless* falsehoods result in arrest and prosecution without probable cause." *Id.* (emphasis added). A showing of "negligence or perhaps a lack of attention to detail . . . does not amount to malicious prosecution." *Id.*

Plaintiff cannot overcome Graham's defense of qualified immunity because he cannot show that Graham participated in the decision to prosecute Plaintiff with the requisite level of blameworthiness. Viewing the evidence in a light most favorable to Plaintiff, Graham's role was to review Foerster's report and direct Foerster to gather more evidence or seek an arrest warrant.[2]

---

[2] Graham argues that his role was more limited. He contends that it was "purely administrative," meaning that he was focused on "whether the case was proceeding in a timely [fashion]"; he did not "conduct a substantive review of the file." (Graham Aff. ¶¶ 7-8, ECF No. 88-1.) However, the Court finds that a reasonable jury could infer that Graham was required to conduct a substantive review and that he did, in fact, conduct such a review. Michigan State Police Order No. 5 required supervisors to ensure that "proper progress" was being made in investigations and to provide "necessary investigative guidance." (Official Order No. 5, PageID.842.) This language suggests that supervisors were expected to do more than simply move cases along. Indeed, Graham himself agreed that he was obligated to

The report indicated that a confidential informant had identified Benny Lopez as a seller of heroin, and that the officer observing the drug transaction had retrieved the information for Benjamin Lopez, who had an alias of Benny.  Graham did not have firsthand knowledge of the facts stated in the report or of the extent of Foerster's investigation, and there is no hint in the report that Benjamin Lopez was not the same individual as the Benny Lopez identified by the informant.[3]  A reasonable officer in Graham's position could have concluded that Foerster had sufficient grounds to seek an arrest warrant for Plaintiff.

This case is not like those in which the facts permitted an inference that the defendant deliberately or recklessly disregarded the truth in order to obtain an arrest warrant or to support charges against the plaintiff.  *See, e.g.*, *King v. Harwood*, 852 F.3d 568, 575 (6th Cir. 2017) (officer withheld exculpatory evidence and gave false or misleading testimony to the grand jury); *Webb v. United States*, 789 F.3d 647, 660-61 (6th Cir. 2015) (officer conspired with an informant to frame the plaintiff by giving false testimony); *Gregory v. City of Louisville*, 444 F.3d 725, 758 (6th Cir. 2006) (officer misled the court as to material facts at the plaintiff's preliminary hearing).  There is no evidence that Graham knowingly or recklessly mispresented or disregarded any facts about Plaintiff when suggesting that Officer Foerster pursue an arrest warrant for him.  If anything, the official behaving recklessly was Foerster, who did not tell Graham or the magistrate that Foerster had simply assumed that Benny was an alias for Benjamin Lopez, or that Plaintiff maintained an address in Grand Rapids.

---

assess the "quality" of investigations.  (Graham Dep. 33.)  Moreover, Graham avers that he "did not identify any obvious problems with the [Lopez] investigation," which suggests that he reviewed the substance of the investigation and not merely its progress.  (*See* Graham Aff. ¶ 9.)

[3] Some evidence indicates that Graham knew about Benny Lopez from a separate investigation into a mobile "meth lab"—for instance, Graham reviewed aspects of that investigation on March 12 and September 27, 2017 (Joint Statement of Material Facts ¶¶ 36, 37, 40, ECF No. 94)—but there is no evidence that Graham was aware, or had reason to believe, that Benny Lopez was not the same person as the Benjamin Lopez mentioned in Foerster's report.

7

Plaintiff faults Graham for not noticing deficiencies in Foerster's investigation and for not taking his own steps to ensure that Foerster had identified the correct suspect. For instance, Plaintiff notes that Foerster failed to make a recording of the drug purchase, did not investigate the phone number used to call Benny, did not identify the vehicle and license plate used by Benny, and did not compare Benny's likeness to Plaintiff's. Plaintiff also contends that Graham could have remedied the misidentification of Plaintiff by searching police databases for Benny Lopez and reviewing TNT's "suspect files" and "past records for information on suspects." (Pl.'s Br. in Resp. to Mot. for Summ. J. 6, ECF No. 107.) According to Plaintiff, such an investigation would have revealed additional information about Benny Lopez, including Benny's association with the driver of the Cadillac Escalade and the fact that Benny had been on a tether a day or two before the drug transaction. Even Graham concedes that, "had Detective Foerster completed an in-house records check through the AICS (Automated Incident Capture system), he would have located Benny Lopez Jr and discovered TNT had a case involving Lopez in 2014. . . . [T]his discovery would have prevented the misidentification of Benjamin Lopez from Grand Rapids." (Graham Aff. ¶ 15, ECF No. 88-1.)

Graham's failure to notice deficiencies in Foerster's investigation, and failure to conduct his own investigation, are not indicative of recklessness toward, or a deliberate disregard of, Plaintiff's constitutional rights. At most, these failures suggest that Graham was negligent and did not pay sufficient attention to the details of Foerster's investigation when directing Foerster to either seek a warrant or conduct further investigation. Ordinary negligence in supervision does not give rise to a viable claim under § 1983. *Hays v. Jefferson Cnty.*, 668 F.2d 869, 873 (6th Cir. 1982). Moreover, negligent conduct by a defendant is not sufficient to overcome the defense of

8

qualified immunity. *Newman*, 773 F.3d at 772. Accordingly, Graham is entitled to qualified immunity for his involvement in the prosecution of Plaintiff.

### B. Continued Detention

Plaintiff also contends that, even if Graham is not liable for the institution of proceedings against Plaintiff, Graham is liable for Plaintiff's continued detention. *See Gregory v. City of Louisville*, 444 F.3d 725, 749-50 (6th Cir. 2006) ("Traditionally, the federal courts have grouped continued detention without probable cause with several other potential injuries under the umbrella of a 'malicious prosecution' claim, actionable under § 1983."); *see also Rehberg v. Paulk*, 566 U.S. 356, 269 (2014) (indicating that "maintenance of a prosecution" could give rise to a claim under § 1983). Plaintiff contends that, as of November 1, 2017, Graham was aware that Plaintiff was not lawfully incarcerated, yet Graham acted with deliberate indifference towards Plaintiff's situation.

The evidence refutes Plaintiff's claim. There is no genuine dispute that, on the day that Graham learned that the police had arrested the wrong person, he told Foerster to contact the prosecutor to dismiss the case. And the following day, Graham met with the prosecutor to convey the same information. Plaintiff contends that Graham should have taken additional steps, such as contacting a judge in Traverse County, but Plaintiff offers no authority for his position that failing to personally contact a court in these circumstances would make a police officer liable under § 1983. Indeed, as the legal representative of the state in its case against Plaintiff, the prosecutor was in the best position to obtain Plaintiff's release by dismissing the case. It is doubtful that a court would have acted to release Plaintiff on the word of Graham alone, without input from the prosecutor. Accordingly, no reasonable juror could find that Graham acted with deliberate indifference after learning of Plaintiff's wrongful detention.

For all the foregoing reasons, Graham is entitled to summary judgment for Plaintiff's malicious prosecution claim.

An order will enter consistent with this Opinion.


Dated:   November 20, 2020              /s/HALA Y. JARBOU
                                        Hala Y. Jarbou
                                        United States District Judge