UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

BENJAMIN LOPEZ,

    Plaintiff,

v.

REGAN FOERSTER, et al.,

    Defendants.

Case No. 1:18-cv-160

Honorable Hala Y. Jarbou

_____/

## OPINION

This is a civil rights action under 42 U.S.C. § 1983. Plaintiff Benjamin Lopez was the victim of mistaken identity. He was arrested and detained in jail for 24 days because police officers working for the Traverse Narcotics Team ("TNT") believed him to be a different person with a similar name. Plaintiff has sued individual officers involved in his arrest and detention for violating his rights under the Fourth and Fourteenth Amendments. He claims that the TNT is also liable because it failed to adequately train and supervise these officers. Before the Court is the TNT's motion to dismiss and/or for summary judgment (ECF No. 90). The Court will grant the motion.

### I. Background

**A. TNT**

The TNT was formed in 2002 by an interlocal agreement between the Michigan counties of Antrim, Benzie, Grand Traverse, Kalkaska, Leelanau, Missaukee, and Wexford, along with the City of Traverse City, the Village of Kalkaska, and the Michigan State Police. (Traverse Narcotics Team Interlocal Agreement, ECF No. 95-7, PageID.700.) The TNT's purpose is to combine the efforts of the participating entities to enforce laws governing the use of narcotics and controlled

substances. (*Id.*) The Interlocal Agreement created a board of directors and required each participating entity to either assign at least one full time police officer to work exclusively for the TNT or provide an "in-kind contribution." (*Id.*, PageID.701.) The police officers remain employed by the participating entity, which pays their wages and other benefits. (*Id.*)

### B. Plaintiff's Arrest

In June 2017, police detectives assigned to the TNT worked with a confidential informant to conduct a controlled purchase of heroin in Traverse City, Michigan. The informant told Officers Regan Foerster and John Bush that the purchaser was "Benny Lopez." Benny Lopez was a resident of Traverse City who was on parole at the time. Benny is not related to Plaintiff in any way. According to a police report prepared by Officer Foerster on June 22, 2017, the informant made several phone calls to Benny to arrange to purchase one gram of heroin. (Incident Report, ECF No. 95-6, PageID.671.) TNT officers saw the informant give some cash to Benny at a gas station. Benny then left the gas station and traveled to the parking lot of a nearby library, where he met with two individuals driving a Cadillac Escalade. A few minutes later, officers observed Benny leave the parking lot to meet with the informant. Officers saw Benny give something to the informant and then leave. The informant met up with Foerster and Bush and gave them the heroin that he had received from Benny.

Foerster assumed that Benny was a nickname or "street name" for Benjamin, so he searched the Law Enforcement Information Network (LEIN) database for Benjamin Lopez; he found Plaintiff's information. (Foerster Dep. 36, 40, ECF No. 95-2.) Accordingly, in his police report, Foerster identified the "suspect" of the investigation as "Benjamin Ben Lopez," who had an alias of "Benny." (Incident Report, PageID.670.) Next to Plaintiff's name in the report, Foerster added Plaintiff's biographical data, including his height, weight, ethnicity, driver's license number, and date of birth. (*Id.*, PageID.670.) Foerster obtained all this information from the LEIN

system.  (Foerster Dep. 36.)  Foerster did not obtain the "alias" information from the LEIN database; he added that himself.  (*Id.* at 35-36.)  Foerster apparently discovered that Plaintiff had a Grand Rapids address, but he did not include that address in the report.  (*Id.* at 35.)

Sergeant Randy Graham was a supervisor for the TNT.  That position required him to review active cases on a monthly basis.[1]  He reviewed Foerster's report in the Lopez case on July 26, August 9, and September 12, 2017.  (Graham Dep. 24, 27-28, ECF No. 95-1.)  After reviewing the report on September 12, Graham made an entry stating, "Reviewed.  Note to Foerster to pursue further purchases or submit your case for a warrant request."  (Incident Report, PageID.676.)

After Graham made his journal entry, Foerster sought an arrest warrant for Plaintiff (Foerster Dep. 18), but when doing so, he did not tell the magistrate judge that the informant had referred to the suspect as "Benny" or that Plaintiff had a Grand Rapids address (*id.* at 46).  The magistrate approved the warrant and the police in Grand Rapids arrested Plaintiff on October 15, 2017.

On November 1, Graham learned that there was a possibility that the police had arrested the wrong person.  (Graham Dep. 82.)  He told Foerster to contact the prosecutor's office to seek a dismissal of the case.  Graham indicated that he would contact his superiors to have Plaintiff released immediately.  (*Id.* at 83.)  The following day, Graham met with the county prosecutor about Plaintiff's situation.  The prosecutor told Graham that the charges would be dismissed.

---

[1] Official Order No. 5 of the Michigan State Police states the following about supervision of cases:

> Work site commanders shall utilize the electronic incident reporting system to review open incident reports at regular intervals to ensure that investigations are being actively pursued and that proper progress is being made.  They shall also ensure that shift supervisors provide the necessary investigative guidance to enforcement members.

(Official Order No. 5, ECF No. 107-6, PageID.842.)

However, Plaintiff remained in jail until November 7, when the prosecutor finally dismissed the case against him.

Plaintiff has sued Officers Regan and Graham, as well as Kalkaska County and the TNT. He claims that the officers violated his constitutional rights by having Plaintiff arrested and then allowing him to remain in jail after they became aware that they had arrested the wrong person. Plaintiff contends that the TNT is liable for failing to adequately train or supervise the officers working for it. The TNT moves for dismissal and/or summary judgment on two grounds: (1) it is not an entity subject to suit; and (2) Plaintiff failed to plead or prove facts sufficient to bring a claim against the TNT.

## II. Standard

### A. Summary Judgment

Defendant initially cites both Rule 12(b)(6) and Rule 56 as the basis for its motion. The Court will consider Defendant's motion under the summary judgment standard in Rule 56 rather than the dismissal standard in Rule 12(b)(6) because both parties rely on evidence outside the complaint to support their respective arguments. *See* Fed. R. Civ. P. 12(d) (requiring the Court to treat a motion for dismissal as one for summary judgment where "matters outside the pleadings are presented to and not excluded by" the Court). Also, Plaintiff repeatedly characterizes Defendant's motion as one for "summary judgment." (Pl.'s Response to Mot. for Summ. J. 2, 12, ECF No. 92.) And Defendant does the same in its reply brief. (*See* Def.'s Reply Br. 1, ECF No. 93.) If the parties believe that Rule 56 supplies the appropriate standard, then the Court will apply that standard.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Courts consider the evidence in the light most favorable to the nonmoving party and draw

4

all reasonable inferences in that party's favor." *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 679 (6th Cir. 2013). The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

### III. Analysis

#### A. Status of the TNT

The TNT first argues that Plaintiff does not state a claim against it because it is not a "juridical entity" capable of being sued. The parties agree that this issue is governed by Michigan law. Under Rule 17(b) of the Federal Rules of Civil Procedure, the capacity of a corporation "to sue or be sued is determined . . . by the law of the state under which it was organized." Fed. R. Civ. P. 17(b)(2). On the other hand, a "partnership or other unincorporated association with no such capacity under [the law of the forum state] may sue or be sued in its common name to enforce a substantive right existing under the United States Constitution or laws[.]" Fed. R. Civ. P. 17(b)(3)(A).

The Urban Cooperation Act (UCA), Mich. Comp. Laws § 124.501 et seq., permits the use of "interlocal agreements" to create a "separate legal entity" with the power to make contracts, to acquire property, and to incur obligations that belong to the entity and not to the parties to the agreement. Mich. Comp. Laws § 124.507(2). The legal entity may be a "commission, board, or counsel constituted pursuant to the agreement." *Id.* § 124.507(1). Such an entity "may sue and be sued in its own name." *Id.* § 124.507(2). Under the 2008 amendments to the UCA, the interlocal agreement must "expressly provide for a separate legal entity" for that entity to exist. If the agreement does not "expressly provide for a separate legal entity, then a separate legal entity shall not be created." *Id.* § 124.507(1).

Both parties have presented compelling arguments for why the TNT should or should not be considered a separate legal entity capable of being sued under the UCA.  On the one hand, the TNT's bylaws give powers to the TNT's board that make it functionally equivalent to a separate legal entity.  The bylaws provide that the board is authorized to "acquire ownership, custody of operation, maintenance, lease or sale of whatever real or personal property which may be necessary for the purpose and function of the [TNT]."  (TNT Bylaws, ECF No. 95-7, PageID.690.)  If the TNT's board can own, lease, and sell property, then it is arguably a separate legal entity.

On the other hand, the current version of the UCA requires the interlocal agreement to "expressly provide" for a separate legal entity.  What does this mean?  Must the agreement use the term "separate legal entity," or is it sufficient if the agreement creates something that looks and acts like a separate legal entity because it has at least one of the powers set forth in § 124.507(2), i.e., the power to acquire property?

Weighing in favor of the TNT's argument is a statement in the Interlocal Agreement that the parties "do not intend by this agreement to establish the [TNT] or its Board of Directors as a separate legal entity under [the UCA]."  (Interlocal Agreement, PageID.700.)  But how does the Court reconcile this statement of intent with the provisions of the Interlocal Agreement that create what appears to be a separate legal entity?

To make matters more complicated, the version of the UCA in effect when the TNT was formed did not require an interlocal agreement to "expressly provide" for a separate legal entity. It simply stated that an interlocal agreement "may provide for" a separate legal entity.  Mich. Comp. Laws § 124.507(1) (1985).  The parties have not explained why the Court should apply the most recent version of the UCA as opposed to the one from 2002, when the Interlocal Agreement became effective.

6

Fortunately, the Court need not wade through these issues because the TNT is entitled to judgment for the reasons explained in the next section.

**B. Municipal Liability**

Assuming that the TNT is an entity capable of being sued, it is entitled to summary judgment because Plaintiff has not shown that the TNT's policy or custom is the cause of the constitutional violations alleged in the complaint.

A municipality or local government entity "cannot be held liable solely because it employs a tortfeasor—or, in other words, [the entity] cannot be held liable under § 1983 on a respondeat superior theory." *Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658, 691 (1978). Instead, the government entity may only be liable under § 1983 when its policy or custom causes the injury, regardless of the form of relief sought by the plaintiff. *Los Angeles Cnty. v. Humphries*, 562 U.S. 29, 35-37 (2010). For this sort of claim, the finding of a policy or custom is the initial determination to be made. *Doe v. Claiborne Cnty.*, 103 F.3d 495, 509 (6th Cir. 1996). The policy or custom must be the moving force behind the constitutional injury, and a plaintiff must identify the policy, connect the policy to the governmental entity and show that the particular injury was incurred because of the execution of that policy. *Turner v. City of Taylor*, 412 F.3d 629, 639 (6th Cir. 2005); *Alkire v. Irving,* 330 F.3d 802, 815 (6th Cir. 2003); *Doe*, 103 F.3d at 508-509.

Plaintiff grounds his claim on a theory that the TNT failed to supervise the officers who were involved in obtaining the arrest warrant and failed to ensure that there were policies in place to avoid mistakes like the ones that harmed him. Because Plaintiff's theory relies on a theory of "inaction," Plaintiff most prove the following:

> (1) the existence of a clear and persistent pattern of violating federal rights . . . ; (2) notice or constructive notice on the part of defendants; (3) the defendants' tacit approval of the unconstitutional conduct, such that their deliberate indifference in failing to act can be said to amount to an official policy of inaction; and (4) that the

>defendants' custom was the "moving force," or direct causal link for the constitutional deprivation.

*Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 607 (6th Cir. 2007) (quoting *Doe*, 103 F.3d at 508); *accord Roberts v. Coffee Cnty.*, 826 F. App'x 549, 557 (6th Cir. 2020) (examining a failure-to-supervise claim).

As proof of a pattern, Plaintiff refers to a single incident occurring "years before" Plaintiff's arrest in which Officer Bush sought an arrest warrant for the wrong person because he mistakenly entered the wrong birth date, resulting in the arrest of a person with the same name as the suspect. (Bush Dep. 60-61, 79, ECF No. 92-3.) This incident, coupled with the facts in Plaintiff's case, is not sufficient evidence of a "clear and persistent pattern" of violating federal rights, let alone deliberate indifference by the TNT to unconstitutional conduct. *See Powell*, 501 F.3d at 607.

Among other things, Plaintiff has not shown that the two incidents are sufficiently similar to demonstrate a "policy" or "custom" of inaction by the TNT as the source of Plaintiff's injury. In the prior case, an officer apparently entered the wrong birth date on the warrant by mistake. But there are not enough facts about that incident to clarify how the arrest resulted from that mistake. In other words, it is not clear what the officer represented to the court in seeking the warrant, or what policies or supervision would have prevented the arrest of the wrong person. In contrast, in Plaintiff's case, the officer's mistakes were of a different kind: first, he made an incorrect assumption about the name of the suspect, causing him to use the wrong name to conduct a LEIN search; and second, he used the LEIN information to request a search warrant, without disclosing material facts in the police report reviewed by his supervisor or in the warrant request submitted to a judge. Plaintiff describes the officer's mistakes as failing to adhere to "proper investigatory procedures." (Pl.'s Response in Opp'n to Def.'s Mot. for Summ. J. 9, ECF No. 92.) He does not contend or show that the prior incident suffered from these same flaws. *See Connick v. Thompson*,

563 U.S. 51, 63 (2011) (finding no municipal liability where the prior incidents were not like the one at issue).

Similarly, Plaintiff does not explain how the mistake in the first incident would have put the TNT on notice or constructive notice of the likelihood of the mistakes in the second.  Put another way, Plaintiff's evidence does not show that "the need to act [was] so obvious that the [TNT's] 'conscious' decision not to act can be said to amount to a 'policy' of deliberate indifference to [Plaintiff's] constitutional rights." *Doe*, 103 F.3d at 508.

Furthermore, to the extent Plaintiff contends that the TNT has a policy or custom of ignoring the rights of those who have been wrongfully detained, he has not provided sufficient evidence to support such a claim.  He has not provided any evidence of a clear and persistent pattern of this sort of misconduct.

In short, assuming that the TNT is an entity subject to suit, Plaintiff's evidence is not sufficient to demonstrate that the TNT is liable for the alleged constitutional violations in Plaintiff's complaint.  Accordingly, the Court will grant summary judgment in the TNT's favor.

An order will enter consistent with this Opinion.


Date:   November 24, 2020                          /s/ Hala Y. Jarbou
                                                   HALA Y. JARBOU
                                                   UNITED STATES DISTRICT JUDGE